IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THEODORE PENDERGRASS** | : | **CIVIL ACTION** |
| | : | |
| v. | : | NO. 08-188 |
| | : | |
| **CHOICEPOINT, INC., et al.** | : | |

**MEMORANDUM AND ORDER**

**Kauffman, J.**                                                                                                       December 9, 2008

Now before the Court is Defendant Rite Aid Corporation's Motion to Dismiss Count III of the Complaint (the "Motion"). For the reasons discussed below, the Motion will be granted in part and denied in part.

**I.  BACKGROUND**

This action arises from Defendant Rite Aid Corporation's termination of Plaintiff Theodore Pendergrass in January 2006 and Defendant ChoicePoint, Inc.'s subsequent listing of him in an employment screening database. As alleged in the Complaint, the relevant facts are as follows: On January 11, 2006, Plaintiff was employed as a shift supervisor at a Rite Aid store in Philadelphia, Pennsylvania when he was approached by a store loss prevention officer and asked to accompany him into the store's "break room." Compl. ¶¶ 16-17. Plaintiff alleges that the loss prevention officer then aggressively questioned him about merchandise losses and coerced him into signing a written statement. Id. ¶¶ 20-23. On January 16, 2006, Plaintiff was terminated for unexplained merchandise losses, fraudulent transactions, and other related infractions. Id. ¶¶ 23-26.

Plaintiff alleges that some time after January 11, 2006, Rite Aid published a report of this incident to ChoicePoint, a "data aggregation company that operates as a private intelligence service to government and industry." Id. ¶¶ 5, 63. One of ChoicePoint's services is Esteem, an employment screening database "that subscribing members use to supplement their background investigations of prospective job applicants." Id. ¶¶ 9-10. Subscribing members, which include many of the largest retail chains in the United States, have 24-hour access to the Esteem database through the internet or other forms of electronic information transfer. Id. ¶¶ 13-14.

After his termination, Plaintiff interviewed with CVS Pharmacy and Walgreens Pharmacy for permanent full-time positions. Id. ¶¶ 28-29. Although he was approved for hiring at both CVS and Walgreens, he was told on or about November 30, 2006 that a "bad report" in his employment history prevented his hiring. Id. According to Plaintiff, the "bad report" was the report Rite Aid submitted to the Esteem database describing the January 11, 2006 incident at Rite Aid as "Cash Register Fraud and Theft of Merchandise," with a total theft amount of $7,313.00. Id. ¶ 31; see also Esteem Report, attached to Compl. at Ex. 2. On July 25, 2007, after unsuccessfully attempting to correct the inaccurate Esteem report with ChoicePoint, Plaintiff received a letter from the retail chain Target that denied his employment application based on a copy of the Esteem report. Compl. ¶ 37.

Plaintiff alleges that Rite Aid made the report "with malice or willful intent to injure [him]" and that Rite Aid "specifically intended to prevent [him] from obtaining future employment." Id. ¶ 64. He further alleges that ChoicePoint "did in fact republish the defamatory report, repeatedly, to its other Esteem subscribers, including but not limited to the said communications to CVS, Walgreens and Target." Id. ¶ 66. As a result, "Plaintiff has been

branded a thief in the eyes of almost every potential employer in his field" and has experienced difficulty finding full-time employment. Id. ¶¶ 44, 69.

On January 10, 2008, Plaintiff filed his Complaint, asserting four causes of action: (Count I) violation of the Fair Credit Reporting Act ("FCRA") § 607, 15 U.S.C. § 1681e(b), against ChoicePoint; (Count II) violations of FCRA §§ 611, 623, 15 U.S.C. §§ 1681i, 1681s-2, against Rite Aid and ChoicePoint; (Count III) a defamation claim under Pennsylvania law against Rite Aid and ChoicePoint; and (Count IV) a false imprisonment claim under Pennsylvania law against Rite Aid. In the instant Motion, Rite Aid seeks dismissal of Count III because the applicable statute of limitations bars Plaintiff's defamation claim.

## II. LEGAL STANDARD

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court is required "to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). In deciding a 12(b)(6) motion, "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). "To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir. 2007) (citations omitted in original) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)). A statute of limitations defense may be raised in the context of a

motion to dismiss where "the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading." United States ex rel. Malloy v. Telephonics Corp., 68 F. App'x 270, 273 (3d Cir. 2003) (quoting Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994)).

**III.  DISCUSSION**

Rite Aid argues that Plaintiff's defamation claim arises from the publication of the allegedly false theft report to ChoicePoint, which Plaintiff discovered on or about November 30, 2006 when he received the letter from Walgreens. See Compl. ¶ 30. Even assuming that the one-year statute of limitations period did not begin until Plaintiff discovered the existence of the publication on or about November 30, 2006, Rite Aid argues that the Complaint is barred because it was filed in January 2008, well beyond the one-year statute of limitations period.[1] See 42 Pa. Cons. Stat. § 5523(1).

Conceding that "many of the events . . . did occur more than one year prior to the January 10, 2008 commencement of this action, including [Rite Aid's] original report to ChoicePoint . . . and the November 2006 republications by ChoicePoint to CVS and Walgreens," Pl.'s Resp. 7, Plaintiff argues that each viewing of the defamatory report in the Esteem database constitutes a

---

[1] "In Pennsylvania, the statute of limitations for defamation claims is one year from the date of publication." Manno v. Am. Gen. Fin. Co., 439 F. Supp. 2d 418, 432 (E.D. Pa. 2006). In cases where a plaintiff, despite the exercise of due diligence, does not know of the injury, the limitations period does not begin to run until discovery of the injury becomes possible through reasonable effort. See, e.g., Smith v. IMG Worldwide, Inc., 437 F. Supp. 2d 297, 305-06 (E.D. Pa. 2006) (applying the discovery rule to a defamation claim). For the purposes of the instant Motion, the Court will presume that the discovery rule delays the beginning of the limitations period to November 30, 2006, when Plaintiff alleges he first learned of the defamatory report.

separate tort, each with its own statute of limitations.  Because the original defamer may be held liable for repetition of the defamatory statement if the repetition was authorized or expected, see Restatement (Second) of Torts § 576 (1977), Plaintiff contends that Rite Aid is liable for the foreseeable repetition of the incident report by ChoicePoint.  Thus, according to Plaintiff, Rite Aid is liable for each "republication" of the Esteem report, including the July 2007 viewing by Target and any other republications occurring within the statutory limitations period.  Therefore, Plaintiff contends, only the portion of his defamation claim that stems from any publication or republication occurring prior to January 10, 2007 is subject to dismissal on statute of limitations grounds.

Under the single publication rule, "any one edition of a book or newspaper, or any one radio, television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication."  Graham v. Today's Spirit, 468 A.2d 454, 457 (Pa. 1983) (quoting Restatement (Second) of Torts § 577A(3)).[2]  As the Supreme Court of Pennsylvania has explained, this rule was designed to "alleviate [the] problem of multiplicity of causes of actions" engendered by the common law rule (also known as the multiple publication rule) that a single publication of material such as a newspaper or magazine results in a separate cause of action each time a reader views the defamatory article.  Id.  The common law rule rendered the statute of limitations "meaningless in that an action could be filed any time a defamatory article was read,

---

[2]  Pennsylvania has adopted the Uniform Single Publication Act by statute.  See 42 Pa. Cons. Stat. § 8341(b) ("No person shall have more than one cause of action for damages for libel or slander, or invasion of privacy, or any other tort founded upon any single publication, or exhibition, or utterance, such as any one edition of a newspaper, or book, or magazine, or any one presentation to an audience, or any one broadcast over radio or television, or any one exhibition of a motion picture.").

no matter the time lag between the actual printing of the article and the reading of the article by a third party." Id. In contrast, under the single publication rule, "it is the original printing of the defamatory material and not the circulation of it which results in a cause of action." Id.

Courts considering the single publication rule in internet-based defamation cases generally have found it applicable to postings made on websites accessible to the general public. As the New York Court of Appeals has explained, "[c]ommunications posted on Web sites may be viewed by thousands, if not millions, over an expansive geographic area for an indefinite period of time. Thus, a multiple publication rule would implicate an even greater potential for endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants." Firth v. State, 775 N.E.2d 463, 466 (N.Y. 2002); see also Oja v. U.S. Army Corps of Eng'rs, 440 F.3d 1122, 1131 (9th Cir. 2006) ("The single publication rule is designed to protect defendants from harassment through multiple suits and to reduce the drain of libel cases on judicial resources. Those same considerations present themselves in relation to Internet publishing, and militate in favor of applying the single publication rule to Internet publication." (citations omitted)).

In cases where, as here, the allegedly defamatory electronic report was not made available to the public but only to subscribing members of a database, the risks of an infinite limitations period and multiple suits are reduced significantly. See Swafford v. Memphis Individual Practice Ass'n, 1998 Tenn. App. LEXIS 361, at *23 (Tenn. Ct. App. June 2, 1998) ("While information in the Data Bank may be accessed by several entities, the justification for the single publication rule, a vast multiplicity of lawsuits resulting from a mass publication, is simply not present here. Under the facts of this case, we hold that the single publication rule is inapplicable."). In

Swafford, the Tennessee Court of Appeals found that the single publication rule did not apply to allegedly defamatory information that the defendants supplied to a national medical practitioner database that was later accessed by database subscribers.  Id.  Because the database was not accessible to the general public, the court found it "unlikely that more than a handful of individuals or entities would gain access to information stored in the data base," and therefore, the defendants' report was not an "aggregate publication" justifying the single publication rule. Id. at *22-23; see also Oja, 440 F.3d at 1133 ("Unlike a typical Internet publication, the information at issue in Swafford was not available for the general public to access, nor could any unregistered and non-specific entities access the registered databank.  Given the exclusive and controlled access to the . . . databank, the release of the offending information could hardly be considered an 'aggregate communication' comparable to typical Internet publication, where access is generally available to anyone at any time.").

Numerous courts have rejected the theory that providing allegedly defamatory or inaccurate information to a consumer reporting agency[3] is equivalent to a mass publication of that information.  See, e.g., Hyde v. Hibernia Nat'l Bank, 861 F.2d 446, 450 (5th Cir. 1988) ("We do not find the rationale underlying the single-publication rule applicable to the Fair Credit Reporting Act.  The major harm may, indeed, result from the first transmission of defamatory material to an institution, but the confidential nature of a credit report necessarily means that each new issuance results in a distinct and separate injury."); Larson v. Ford Credit, 2007 U.S.

---

[3] Plaintiff alleges that ChoicePoint is a "consumer reporting agency" under the FCRA.  See Compl. ¶ 47.  Under the FCRA, a "consumer reporting agency" includes an agency that furnishes reports for the determination of an individual's creditworthiness or for employment purposes.  See 15 U.S.C. § 1681a(d), (f).

Dist. LEXIS 47181, at *11 (D. Minn. June 27, 2007) ("There is simply no way to equate the provision of a consumer's information to consumer reporting agencies with the mass distribution of a newspaper's or magazine's claimed defamatory statement.  Credit information is confidential; dissemination is limited; and it is easy to determine exactly when and to whom the information was disseminated."); Jaramillo v. Experian Info. Solutions, Inc., 155 F. Supp. 2d 356, 360 (E.D. Pa. 2001) (following Hyde and declining to apply the single publication rule to a defendant that made allegedly inaccurate credit reports to two consumer reporting agencies).[4]  These courts have concluded, therefore, that each transmission of the defamatory information is a separate republication of that material, giving rise to a new cause of action.  See Lawrence v. Trans Union, L.L.C., 296 F. Supp. 2d 582, 587 (E.D. Pa. 2003) ("Each transmission of the same credit report is a separate and distinct tort to which a separate statute of limitations applies."); Schneider v. United Airlines, 256 Cal. Rptr. 71, 74-75 (Ct. App. 1989) (explaining that the Uniform Single Publication Act protects publishers that distribute many copies of a defamatory item at a single time but does not apply to transmission of defamatory information at different times).[5]  The Court finds these cases persuasive, as Rite Aid did not circulate the report to a wide

---

[4]   The cases cited above address claims under the FCRA rather than common law claims for defamation.  Therefore, they do not control application of the single publication rule to a defamation claim under Pennsylvania law.  Nevertheless, the Court finds these decisions persuasive in that they highlight the reasons a report made to a consumer reporting agency is not considered a "mass publication" subject to the single publication rule.

[5]   The Court is aware of two district court decisions finding that defamatory information transmitted to a consumer reporting agency is not "republished" if the information is released on separate occasions without alteration.  See Gold v. Berkin, 2001 U.S. Dist. LEXIS 1206, at *12-13 (S.D.N.Y. Feb. 9, 2001); Ferber v. Citicorp Mortgage, 1996 U.S. Dist. LEXIS 1210, at *17-18 (S.D.N.Y. Feb. 5, 1996).  As the Restatement explains, however, "republication" can occur even if the defamatory material is not altered, depending on whether the second publication occurred on a separate occasion.  See Restatement (Second) of Torts § 577A cmt. d

audience; instead, it transmitted it to ChoicePoint with the knowledge that it would be made available to subscribing Esteem customers upon request.

Although the Pennsylvania courts have not decided whether to apply the single publication rule to information conveyed to consumer reporting agencies,[6] the Court concludes that given the vast differences between traditional "mass publication" for a general audience and confidential publication to a consumer reporting agency, the single publication rule would not apply in the instant case. Unlike a single publication that reaches many viewers through circulation of the original material, information in the Esteem database is viewed on separate, distinct occasions by subscribing members. See Swafford, 1998 Tenn. App. LEXIS 361, at *22-

---

("[T]he single publication rule . . . does not include separate aggregate publications on different occasions. Thus if the same defamatory statement is published in the morning and evening editions of a newspaper, each edition is a separate single publication and there are two causes of action. . . . In these cases the publication reaches a new group and the repetition justifies a new cause of action."). In the instant case, although the original report was not altered, it was distributed to Target nearly one year after Plaintiff discovered its existence in November 2006.

[6]  Rite Aid argues that the district court in Jaramillo, 155 F. Supp. 2d 356, recognized that under Pennsylvania law, the statute of limitations begins to run only from the date upon which the defendant made its report to the consumer reporting agency. However, in Jaramillo, the defendant allegedly transmitted a false report to two credit agencies that later republished the information, thereby affecting the plaintiff's ability to obtain credit. Id. at 358. With respect to the defamation claim, both the defendant and the district court assumed that the final known date of publication was in April 1999, when the two consumer reporting agencies republished the allegedly defamatory material. Id. at 360. The defendant argued that because the April 1999 republishing occurred more than one year prior to the filing of the complaint, the defamation claim was time-barred. Id. The district court rejected this argument as premature, noting that the plaintiff had alleged that the defendant continued making inaccurate reports and that discovery would permit a fuller examination of the limitations question. Id. at 360-61. Nowhere in Jaramillo did the district court reject the assumption that the statute of limitations would run from the final known republication in April 1999; rather, the court was required to inquire further because even that date was outside the limitations period. In the instant case, however, additional inquiry is unnecessary because the known republication in 2007 did occur within the limitations period.

23 ("[T]he health care entities in this case, like the entities accessing credit information, requested information from the Data Bank on separate and distinct occasions. Therefore, there is no 'aggregate publication' as contemplated in cases applying the single publication rule."). The risks of an infinite statute of limitations resulting from widespread circulation of a single publication are not present in the instant case. Rite Aid made an allegedly false report to a confidential database that was viewed exclusively by subscribing members. See Musto v. Bell South Telecomms. Corp., 748 So. 2d 296, 298 (Fla. Dist. Ct. App. 1999) ("[T]he rationale underlying the single publication rule of avoiding a vast multiplicity of lawsuits that would result from defamatory statements contained in a mass publication such as a newspaper or magazine, is not a concern in a credit slander case."). Because the risks justifying the rule are not present, the Court finds that Pennsylvania courts would not apply the single publication rule to the facts of this case.

## IV.  CONCLUSION

Because Plaintiff filed his Complaint on January 10, 2008, the Court will deny the Motion with respect to any republication of the Esteem report that occurred on or after January 10, 2007. The Court will dismiss the portion of Count III against Rite Aid for any republication occurring prior to that date as time-barred. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THEODORE PENDERGRASS** | : | **CIVIL ACTION** |
| | : | |
| v. | : | **NO. 08-188** |
| | : | |
| **CHOICEPOINT, INC., et al.** | : | |

**ORDER**

      **AND NOW**, this 9th day of December, 2008, upon consideration of Defendant Rite Aid Corporation's Motion to Dismiss Count III of the Complaint (docket no. 13), Plaintiff's response thereto (docket no. 16), and Rite Aid Corporation's Reply (docket no. 17), and for the reasons stated in the accompanying memorandum, it is **ORDERED** that the Motion is **GRANTED IN PART** and **DENIED IN PART**. Accordingly, Count III of the Complaint against Rite Aid shall be **DISMISSED** with respect to any publication or republication occurring prior to January 10, 2007.

                                           BY THE COURT:

                                           S/ BRUCE W. KAUFFMAN
                                           BRUCE W. KAUFFMAN, J.